# NATIONAL REGISTERED AGENTS, INC.

## SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM

To:   Steven E. Fox
      GreenSky, LLC
      5565 GLENRIDGE CONNECTOR, SUITE 700
      ATLANTA, GA 30342

SOP Transmittal #   **538579621**

800-592-9023 - Telephone

Entity Served:   GREENSKY, INC  (Domestic State: DELAWARE)

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc. or its Affiliate in the State of GEORGIA on this 12 day of November, 2020. The following is a summary of the document(s) received:

1.   **Title of Action:**  ALEXISS WRIGHT, ETC., PLTF. vs. GREENSKY, INC., ET AL., DFTS.

2.   **Document(s) Served:**   Other: -

3.   **Court of Jurisdiction/Case Number:** None Specified
                                Case # None Specified

4.   **Amount Claimed, if any:**  N/A

5.   **Method of Service:**

     _X_ Personally served by:        _X_ Process Server        ___ Law Enforcement        ___ Deputy Sheriff        ___ U. S Marshall

     ___ Delivered Via:            ___ Certified Mail        ___ Regular Mail        ___ Facsimile

     ___ Other (Explain):

6.   **Date and Time of Receipt:**   11/12/2020 02:47:00 PM CST

7.   **Appearance/Answer Date:**  None Specified

8.   **Received From:**     None Specified            9.  **Carrier Airbill #** 1ZY041160197222815

                                                      10.  **Call Made to:** Not required

11.     **Special Comments:**
SOP Papers with Transmittal, via  UPS Next Day Air

Image SOP

Email Notification,  Steven E. Fox  steve.fox@greensky.com

Email Notification,  Ann Broussard  ann.broussard@greensky.com

Email Notification,  Camille Johnson  camille.johnson@greensky.com

Email Notification,  Andrea Hill  andrea.hill@greensky.com

Email Notification,  Camille Johnson  camille.johnson@greensky.com

**NATIONAL REGISTERED AGENTS, INC.**                    **CopiesTo:**

Transmitted by   Amy McLaren

The information contained in this Summary Transmittal Form is provided by National Registered Agents, Inc. for informational purposes only and should not be considered a legal opinion. It is the responsibility of the parties receiving this form to review the legal documents forwarded and to take appropriate action.

ORIGINAL

## IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
## IN AND FOR BROWARD COUNTY, FLORIDA

|  |  |  |
|---|---|---|
| **ALEXISS WRIGHT**, an individual, on behalf of herself and others similarly situated, | ) ) ) | Case No.: |
|  | ) ) | **CLASS REPRESENTATION** |
| Plaintiff, | ) ) |  |
| v. | ) ) | **JURY TRIAL DEMAND** |
| **GREENSKY, INC.**, a corporation, | ) ) ) ) |  |
| and | ) ) |  |
| **GREENSKY, LLC**, a limited liability company, | ) ) ) |  |
| and | ) ) |  |
| **GREENSKY HOLDINGS, LLC**, a limited liability company, | ) ) ) |  |
| and | ) ) |  |
| **GREENSKY MANAGEMENT COMPANY, LLC**, a limited liability company, | ) ) ) ) | Summons is already issued for this |
| Defendants. | ) ) ) |  |

### SUMMONS

**STATE OF FLORIDA:**

To all and Singular Sheriffs of said State:

**YOU ARE HEREBY COMMANDED** to serve this Summons and a copy of the Complaint in this action on Defendant **GreenSky, Inc.** by serving its registered agent / owner at:

**National Registered Agents. Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046**

Defendant is required to serve written defenses to the Complaint on **Darren R. Newhart, Esq.,** Fla. Bar No. 0115546, of **Newhart Legal, P.A.** located at P.O. Box 1351 Loxahatchee, FL, 33470.

**Primary E-mail: Darren@newhartlegal.com** within 20 days after service of this Summons on the Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If a Defendant fails to do so, a default will be entered against that Defendant for the relief demanded in the Complaint.

WITNESS my hand and seal of this Court.

As Clerk of said Court

By:_____/
    Deputy Clerk

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint with the Clerk of the Court. A phone call will not protect you; your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case. If you do not file your written response on time, you may lose the case, and your wages, money, and property may be taken thereafter without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).
If you choose to file a written response yourself, at the same time you file your written response to the Court, you must also serve a copy of your written response to the "Plaintiff's Attorney" named below.

"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, Diana Sobel, Room 20140, 201 S.E. Sixth Street, Fort Lauderdale, Florida 33301, 954-831-7721 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene veinte (20) dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Localizado en: . Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere

su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, usted puede consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presente su respuesta ante el tribunal, usted debe enviar por correo o entregar una copia de su respuesta a la persona denominada abajo cini "Plaintiff/Plaintiff's Attorney." (Demandate o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciaries ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal.  Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le delai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre response ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocet) nomme ci-dessous.

## IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
## IN AND FOR BROWARD COUNTY, FLORIDA

ALEXISS WRIGHT,                           )
an individual, on behalf of herself       )        Case No.:
and others similarly situated,            )
                                          )
                                          )        CLASS REPRESENTATION
            Plaintiff,                    )
                                          )
v.                                        )        JURY TRIAL DEMAND
                                          )
GREENSKY, INC.,                           )
a corporation,                           )
                                          )
and                                       )
                                          )
GREENSKY, LLC,                            )
a limited liability company,              )
                                          )
and                                       )
                                          )
GREENSKY HOLDINGS, LLC,                   )
a limited liability company,              )
                                          )
and                                       )
                                          )
GREENSKY MANAGEMENT                       )
COMPANY, LLC,                             )
a limited liability company,              )
                                          )
            Defendants.                   )

### CLASS ACTION COMPLAINT

1.     Plaintiff Alexiss Wright (née Hipps) brings this class action petition against

Defendants to recover damages for herself and others similarly situated caused by

GreenSky's failure to comply with state loan brokering and credit services laws. This

petition also requests injunctive relief. On information and belief, Plaintiff alleges as

follows:

## PARTIES, JURISDICTION, AND VENUE

2.      Plaintiff ("Plaintiff" or "Wright") is a natural person over the age of 18, a consumer, and a resident of Florida.

3.      Defendant GreenSky, Inc. is a publicly traded corporation. It is incorporated in Delaware (#6405292) with its principal place of business in Georgia. GreenSky, Inc. may be served by serving National Registered Agents. Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

4.      Defendant GreenSky Holdings, LLC is, on information and belief, a shell entity that was created to effect the initial public offering of Defendant GreenSky, Inc. GreenSky Holdings, LLC may be served by serving National Registered Agents. Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

5.      Defendant GreenSky, LLC is a limited liability company that is wholly owned by Defendant GreenSky Holdings, LLC and controlled by Defendant GreenSky, Inc. GreenSky, LLC may be served by serving National Registered Agents. Inc., 289 S. Culver Street, Lawrenceville, Georgia 30046.

6.      Defendant GreenSky Management Company, LLC, is registered in Florida as a foreign limited liability company. GreenSky Management Company, LLC may be served by serving NRAI Services, Inc., 1200 S. Pine Island Road, Plantation, Florida 33324.

7.      These four GreenSky entities are collectively referred to as "GreenSky."

8.      Subject-matter jurisdiction is proper in this Court under Fla. Stat. § 687.147, which endows those injured by violations of Florida's loan broker law with a private

cause of action, and Fla. Stat. § 817.706, which endows those injured by violations of the State Credit Repair Statute with a private cause of action.

9.      Venue is proper in this Court under Fla. Stat. § 47.051 as Defendant GreenSky Management Company, LLC has an agent in Broward County.

## SUBSTANTIVE ALLEGATIONS

### Florida Loan Broker and CSOA Laws

10.      Entities that broker consumer loans in Florida are regulated by, among other laws, Fla. Stat. § 687.14 *et seq.*

11.      Entities that obtain extensions of credit or advise or help obtain extensions of credit for consumers, known as credit services organizations, are regulated by the Florida Credit Service Organizations Act (CSOA), Fla. Stat. § 817.7001 *et seq.*

12.      Broadly speaking, the loan brokering laws and CSOA require consumer loan brokers and credit services organizations to abstain from certain business practices unless they are licensed or chartered; prohibit misrepresentations, fraudulent and deceptive acts in connection with making or aiding in the extension of loans; and provide remedies for consumers harmed by unlawful lending practices.

13.      For example, no loan broker may "[m]ake or use **any false or misleading representations or omit any material fact** in the offer or sale of the services of a loan broker or engage, **directly or indirectly**, in **any act that operates or would operate as fraud or deception** upon any person in connection with the offer or sale of the services of a loan broker, **notwithstanding the absence of reliance by the buyer.**" Fla. Stat. § 687.141(2) (emphasis added).

14.     The CSOA, using nearly identical language, sets forth the same proscriptions for credit services organizations.

15.     By concealing the nature and amount of its merchant fees from consumers, as described below, as well as by other aspects of its business, GreenSky has violated both the loan brokering law and CSOA tens, or hundreds, of thousands of times in Florida.

16.     These laws also limit the nature and amount of fees that lenders, brokers, and credit services organizations may charge consumers for lending, obtaining, or helping consumers obtain loans, and require all fees associated with providing these services to be disclosed.

17.     The CSOA also mandates several disclosures and decrees that credit services organizations are prohibited from charging any fee to refer consumers to third-party lenders for loans where the loan terms are substantially the same as those available to the public, or that would have been extended to the consumer without the credit services organization's assistance. Fla. Stat. § 817.7005(2).

18.     As described below, GreenSky operates in Florida as a consumer loan broker and credit services organization while engaging in practices prohibited by the brokering law and CSOA.

### GreenSky's Business Model

19.     GreenSky has built a billion-dollar business partnering with lending institutions and merchants to offer point-of-sale loans to consumers who wish to finance home improvement projects and repairs, solar-panel installation, and elective surgery.

20.     The merchants in GreenSky's program are a group of over 17,000 contractors and other home improvement specialists, as well as medical offices.

21.     GreenSky's bank partners are a group of about 12 lending institutions, including regional banks SunTrust (now Truist), Fifth Third, and BMO Harris.

22.     Merchants in GreenSky's program connect their customers with GreenSky's bank partners using GreenSky's mobile app, which allows GreenSky to orchestrate the entire lending process, from application to funding.

23.     As discussed below, GreenSky earns the vast bulk of its revenues by taking an undisclosed cut on the front side of a consumer loan: GreenSky receives what it calls a "merchant fee," which is calculated as a percentage of the loan principal.

### The Loan-Origination Process

24.     Merchants in GreenSky's program can submit applications for GreenSky-branded loans for their customers in minutes using the GreenSky app on a tablet or smartphone.

25.     GreenSky thereby orchestrates the loan origination process before a bank is involved.

26.     To apply, the merchant first selects one of the GreenSky program's loan products, which vary by APR, loan duration, GreenSky's own "promotional" terms and, accordingly, merchant fee. The consumer rarely, if ever, sees the full range of loan plans offered by the GreenSky program.

27.     Further, the majority of the merchants—roofers, plumbers, HVAC specialists—that use GreenSky's app have no significant training in consumer finance

and are incentivized to sell more of their product rather than properly tell borrowers about the loan terms.

28.     After GreenSky's app has auto-populated some of the consumer's information (e.g., their address based on GPS location), the customer or merchant enters some of the customer's personal information into GreenSky's app, including the customer's address, income, and social security number, and the merchant submits the application to GreenSky for approval.

29.     GreenSky then runs the customer's credit, and approves or denies the loan — usually in seconds — based on the criteria supplied by its bank partners and its own proprietary risk calculations, and allocates the loan to one of its bank partners for funding according to its own proprietary "round-robin" system.

30.     Once GreenSky approves the loan, and arranges for one of its banking partners to fund the loan, the GreenSky app generates a "shopping pass" for the consumer's loan, like the one below. The shopping pass has a sixteen-digit number that functions like a credit card:



31.     GreenSky tells the merchant to take a picture of the shopping pass as soon as it is generated. The merchant can also independently access the shopping pass through a merchant portal. This means that the merchant is always privy to the consumer's shopping pass information.

32.     GreenSky afterward mails (and in some cases emails) the consumer a copy of the shopping pass and loan agreement, and arranges for the consumer to make payments on the loan, which GreenSky usually services. This is typically the first time in the lending process that the consumer sees the loan terms.

33.     Theoretically, after receiving the shopping pass, the consumer then gives the sixteen-digit number to the merchant and authorizes it to be charged for completed services. But in practice, since the merchant receives the shopping pass through the app as soon as it is generated, merchants may charge the shopping pass upon approval without waiting for further action by the consumer.

34.     Once GreenSky charges the shopping pass, the loan is funded through the MasterCard network, by the bank partner GreenSky to which has allocated the loan.

35.     The graphic below, taken from one of GreenSky's own presentations, depicts how it essentially acts as a middle-man between banks, merchants, and consumers:



## Economic Model

36.     This depiction, however, neglects to mention that the "transaction fee" may be included as project "overhead" by the merchants, so that consumers pay some or all of GreenSky's illicit fees, as well as the fact that GreenSky receives some of the "APR" payments as "incentive payments," which result from anti-competitive and deceptive practices.

**GreenSky Receives Unlawful Fees
and Otherwise Violates Florida Loan Brokering Laws and the CSOA**

37.     In connection with each GreenSky-branded loan, GreenSky is paid a predetermined percentage of the loan, which GreenSky calls a "merchant fee" (or sometimes a merchant "transaction fee").

38.     GreenSky calculates the merchant fee by multiplying a set fee percentage (as outlined in a schedule that GreenSky provides to the merchants) by the dollar amount of the loan principal. The fee is "due and payable to GreenSky upon the funding of [the l]oan."

39.     The merchant fee rates are calculated by GreenSky to neutralize sources of risk, which include the "promotions" offered solely by GreenSky; as a result, merchant fees are higher relative to the attractiveness of the given promotion, a fact that is likewise concealed from consumers.

40.     **The merchant fees result from a contract, between GreenSky and the merchants, to which consumers are not privy**. GreenSky also provides the merchants with the fee schedules that determine the magnitude of the required fee; consumers are not, of course, privy to these schedules either. Thus, GreenSky's merchant fees (illicit finance charges) result from, in essence, a kick-back from the merchants to GreenSky.

41.     GreenSky has encouraged merchants to build GreenSky's fees into project "overhead" so that they may be passed on to consumers.

42.     These merchant fees make up the bulk of GreenSky's revenue and profitability. Thus, GreenSky's "profitability is strongly correlated with merchant transaction volume."

43.     Although the precise amounts of the merchant fees are based on the variables listed above, GreenSky currently collects about 7% of the total loan amount as a merchant fee per loan.

44. That approximate 7% level has been reduced in recent years from an approximate 9% level. The primary reason for this reduction is GreenSky's reduction in funding high-interest, predatory loans for the installation of solar systems.

45. Because consumers tend to use Greensky-program financing for expensive projects (approximately $9,000, on average), the fee that GreenSky collects is typically larger than an ordinary "transaction fee" and, again, *increases with the amount of the loan*.

46. And because GreenSky-program loans typically come with terms (including APR and loan period) substantially similar to what a consumer could receive by securing financing directly from the lender, as discussed below, under the CSOA, GreenSky is prohibited from charging any fee in connection with these loans.

47. As GreenSky's Vice Chairman and CEO, respectively, explained in an investor call, GreenSky encourages merchants to pass these fees onto consumers:

> Andrew Jeffrey [financial analyst]: "I guess your research as I understand it is that merchants' willingness to pass on higher transaction costs to consumers, and consumers' willingness and desire to sort of absorb these costs . . . even though the consumer might be paying more today than he was yesterday, he still feels like he's getting a pretty good deal. Did I sort of summarize that reasonably well . . ."

> Gerry Benjamin [GreenSky Vice Chairman and CAO]: "Yes. Absolutely."

> David Zalik [GreenSky founder, CEO, and Chairman]: "Even as we've had nearly half a dozen rate increases, what the merchants do is if it's a particular merchant that used to spend 7% when Fed funds were near zero, and we've raised their price 200 or 300 basis points [2 or 3% of principal] on whatever plan they were using, what the merchants do is say, I'm going to still only spend 7%. And they're going to choose a product that is more expensive for the consumer, which is still great for the consumer because relative to market rates, the consumer is still getting a promotion that is worth 7%."

48.    GreenSky may also receive "incentive payments" from its bank partners. **These incentive payments stem from loan origination agreements between the banks and GreenSky to which consumers are not privy.**

49.    Generally, incentive payments stem from GreenSky's "waterfall structure," as shown below, which overtly incentivizes GreenSky to generate loans with APRs higher than what the banks would otherwise be willing to accept because GreenSky keeps a portion of the interest rate spread (the excess above the "agreed-upon target margin").

50.    These incentive payments are unknowingly paid by GreenSky-program customers in the form of interest payments.

51.    Generally, GreenSky's "round-robin" allocation system, along with the waterfall structure, is anticompetitive, with GreenSky and the banks splitting interest rate spreads at the expense of consumers.



**GreenSky**

**Our Waterfall Structure with Our Bank Partners is a Key Innovation for Our Company & Pillar of Our Success**

We May Collect Incentive Payments
from Bank Partners

Billed portfolio yield
10%

Fixed servicing fee
(1%)

Agreed-upon
target margin paid to
bank partner
(4%)

Realized credit losses
(2.75%)

Cash escrow
1%

Illustrative
incentive payment
2.25%

52.     In effectuating and approving the loan, GreenSky never discloses the nature or amount of its merchant fee or possible incentive payments to consumers.

53.     For approximately 40% of its loan book, GreenSky offers "promotional period" loan products, which are defined by a period—usually, six to eighteen months—of possible interest "waiver." These are, in essence, deferred-interest loan products.

54.     This means that, should the borrower be able to pay back the entirety of the loan principal before the end of the promotional waiver period, then the accrued interest will be, per GreenSky, "waived."

55.     However, that accrued interest is not *actually* waived by the bank; rather, GreenSky makes a remittance to the bank in the amount of the accrued interest should the consumer be able to pay back the entire loan before the deadline.

56.     GreenSky calls these remittances "finance charge reversals" (FCRs) and treats them as a cost of revenue.

57.     Because the bank—but not GreenSky—receives the stated interest rate regardless of whether the consumer is able to pay the loan back within the waiver period, the *banks* do not actually offer such waiver periods—they are a promotional term offered by GreenSky alone.

58.     Of course, GreenSky is not in the business of simply subsidizing high-interest loan payments for the many consumers who are able to pay off their loans before the deadline.

59.     Rather, in order to compensate itself and neutralize the risk associated with waiver periods and possible FCRs, GreenSky charges higher merchant fees as the waiver

period increases. Again, GreenSky does not disclose these fees, fee schedules, or the nature of this arrangement to consumers.

60.    The black line in the graph below, taken from a GreenSky investor presentation, depicts the inversion (higher APRs for higher credit scores) for loan products with waiver periods, or "deferred rates":[1]



61.    Per this chart, loans with deferred rates have a weighted average APR of over 24% on a FICO score of nearly 780. That can be compared to weighted averages of

---

[1] GREENSKY, INC., (Corrected) First Quarter 2020 Investor Presentation, p. 22 (May 11, 2020), *available at* http://investors.greensky.com/static-files/668cde41-ef21-4145-b3be-41fee614acaf (last visited July 15, 2020).

about a 7% APR on a 710 FICO score for "reduced rate" products, which carry increasingly large merchant fee rates to compensate for reduced interest rates.

62.     The practical effect of such an arrangement is that the banks harvest higher weighted-average APRs (the green line) on their GreenSky-program portfolios because of the high APRs associated with waived-interest promotional period loans.

63.     GreenSky hedges the interest-rate risk through its merchant fee schedules and benefits from, in aggregate, the higher APRs stemming from the waived-interest promotional loans because of incentive payments.

64.     In the case of consumers who are unable to pay off the loan principal before the waiver deadline, GreenSky keeps the higher merchant fee, does not remit an FCR, and the bank keeps the high interest payments.

65.     GreenSky's consumer customers have paid for this illegal arrangement through hidden merchant fees and higher interest rates.

### GreenSky Offers Loans on the Same Terms as Those Available to the General Public

66.     Despite—or perhaps because of—GreenSky's taking of a large upfront fee, as well as back-end "incentive payments," the terms of GreenSky-branded loans are often not better for consumers than what they would receive outside the GreenSky program.

67.     For example, SunTrust, one of GreenSky's largest bank partners by volume, offers home improvement loans directly to consumers on substantially the same—and often better—terms than those offered by GreenSky.

68.     According to SunTrust's website, through a program called LightStream, SunTrust offers home improvement loans on an unsecured basis, with durations from 24

to 144 months, for amounts from $5,000 to $100,000, with "same day funding available,"

"no fees," for large projects such as adding kitchens, swimming pools, or solar systems,

and "will beat any qualifying rate."

69.     The applicable APR-duration-loan amount matrix for LightStream loans, as

of April 8, 2020, was:

Loan Term (months) *

| Loan Amount | 24 - 36 | 37 - 48 | 49 - 60 | 61 - 72 | 73 - 84 | 85 - 144 |
|---|---|---|---|---|---|---|
| $5,000 to $9,999 | 7.84% - 13.29% | 8.59% - 14.39% | 9.09% - 14.99% | 9.84% - 15.29% | N/A | N/A |
| $10,000 to $24,999 | 4.99% - 13.29% | 7.19% - 14.14% | 7.79% - 14.49% | 8.39% - 14.79% | 8.94% - 14.99% | N/A |
| $25,000 to $49,999 | 6.59% - 13.29% | 7.19% - 14.14% | 7.79% - 14.49% | 8.39% - 14.79% | 8.94% - 14.99% | 6.89% - 14.99% |
| $50,000 to $100,000 | 6.59% - 13.29% | 7.19% - 14.14% | 7.79% - 14.49% | 8.39% - 14.79% | 8.94% - 14.99% | 6.89% - 14.99% |

70.     By comparison, a GreenSky-branded SunTrust loan product generated in

June 2017 for $10,000 carried an APR of 23.99% over a duration of 36 months—much

higher than the 4.99 to 13.29% APR offered directly through SunTrust.

71.     To the extent GreenSky takes prepayment risk (i.e., finance charge reversal

risk, as explained *below*) on such loans, it is compensated by higher front-end merchant

fees, which are passed on to consumers and relatively expensive owing to the time value

of money.

72.     In aggregate, relative to SunTrust, which has funded around $7 billion in total GreenSky-program loans, SunTrust keeps meaningfully higher interest rate payments, splits some of these excess payments with GreenSky, and GreenSky charges higher merchant fees to cover for the higher APRs.

73.     Therefore, GreenSky accepts valuable consideration for obtaining credit on "substantially the same" (if not significantly worse) terms as those available to the public.

74.     For approximately 40% of its loan volume, GreenSky offers "promotional" loans with "waived" interest promotional periods (usually six to 18 months) in which to repay the loan principal in full without incurring interest charges. If the consumer fails to pay off the entire loan during the promotional period, the accrued interest is added to the remaining principal once the promotional period expires. Since GreenSky is assuming the pre-payment risk for these loans with promotional periods, it charges higher merchant fees in connection with them.

75.     If a consumer does happen to pay back the entirety of the loan principal within the promotional period, then GreenSky remits a "finance charge reversal" to the relevant bank partner in the amount of the forgone interest.

76.     Thus, such waived-interest promotional periods are not offered by the banks: they are a financing term belonging solely to GreenSky as the banks receive the stated APR regardless. Consumers are not privy to this arrangement and, again, GreenSky charges consumers more to cover promotional-period risk.

77. Despite its role as a consumer loan broker and credit services organization, GreenSky is not registered as such in, on information and belief, *any* of the many states that require licensure/registration of loan brokers and credit service organizations.

78. Instead, GreenSky attempts to pass itself off as merely a "loan servicer," "program administrator," or "payment platform." This constitutes a calculated deception, of consumers and regulators, designed to conceal the fact that GreenSky takes undisclosed finance charges on consumer loans.

79. GreenSky's attempts to paint itself as just a payment platform or loan servicer do not square with the loan process described above, or with GreenSky's investor materials, public statements, and financial reports.

80. GreenSky's IPO prospectus touts its central role in the lending process, telling investors that GreenSky's platform supports "the full transaction lifecycle, including credit application, underwriting, real-time allocation to bank partners, funding, settlement, and servicing."

81. GreenSky's financial statements confirm that the lion's share of its revenues come from brokering fees—both merchant fees and incentive payments from its partner banks—not from loan servicing or software licenses.

82. For example, in its 2019 Form 10-K, GreenSky told investors, "We derive most of our revenue and profitability from upfront transaction fees that merchants pay us every time they facilitate a transaction using our platform."

83. GreenSky's practice of originating consumer loans without a license has been challenged by regulators and consumers in several states.

84.     The New Jersey Department of Banking and Insurance sent GreenSky a letter in 2015 regarding its "possible unlicensed New Jersey consumer loan activity," prompting GreenSky to register as a "money transmitter" in New Jersey.

85.     In 2017, a federal court in Florida upheld a complaint filed by a consumer alleging that GreenSky operated improperly as a credit services organization.

86.     And, last year, a court-appointed receiver in Alabama concluded that GreenSky loans in the state "were improperly obtained and should be invalidated," after finding that GreenSky "d[id] not have a license to engage in lending activity in the State of Alabama, and had "[e]ffectively [] made plumbers with no banking training or experience its de facto loan officers."

87.     In sum, despite what GreenSky says, and despite not being licensed to do so (i.e., none of the GreenSky entities have registered to do business and/or be licensed in the State of Florida as a CSOA or a loan broker), GreenSky brokers and facilitates loans for consumers across the state, extending credit without providing required disclosures, and charging substantial undisclosed fees, in clear violation of Florida laws.

## PLAINTIFF'S EXPERIENCE

88.     Plaintiff Alexiss Wright (née Hipps) is a resident of Florida.

89.     In the summer of 2016, Wright purchased a new air-conditioning system.

90.     That purchase was financed by the GreenSky program.

91.     Per the terms of Wright's GreenSky installment loan agreement, the APR was **0.00%**.

92.     GreenSky took a "merchant fee" of approximately *16% of principal* on Wright's loan.

93.     The principal amount of Wright's loan was $9,522.

94.     Thus, GreenSky took a "merchant fee" of about $1,500 on Wright's loan.

95.     This amount was not disclosed to Wright.

96.     Wright unknowingly paid some or all of GreenSky's merchant fee.

97.     Wright paid that loan off in late 2018.

## TOLLING OF THE STATUTE OF LIMITATIONS

98.     <u>Discovery Rule</u>: Plaintiff's and class members' claims accrued upon discovery of the facts described above. While GreenSky knew, and concealed, these facts, Plaintiff and class members could not and did not discover these facts through reasonable diligent investigation.

99.     <u>Active Concealment Tolling</u>: Any statutes of limitations are tolled by GreenSky's knowing and active concealment of the facts set forth above. GreenSky kept Plaintiff and class members ignorant of vital information essential to the pursuit of their claims, without fault or lack of diligence on Plaintiff's or class members' part. The details of GreenSky's efforts to conceal its above-described unlawful conduct—including its failure to disclose material facts concerning the nature and amount of the fees it charges consumers and the illicit nature of its lending practices—are in its possession, custody, and control, to the exclusion of Plaintiff and class members, and await discovery. Plaintiffs and class members could not have reasonably discovered these facts, nor that GreenSky failed to disclose them.

100.   Estoppel: GreenSky was and is under a continuous duty to disclose to Plaintiff and class members the nature and amount of the fees it charges consumers and the unlicensed nature of its lending practices. At all relevant times, and continuing to this day, GreenSky knowingly, affirmatively, and actively concealed these facts. The details of GreenSky's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiff and class members, and await discovery. Plaintiff and class members reasonably relied on GreenSky's active concealment, and GreenSky is therefore estopped from relying on any statutes of limitation in defense of this action.

101.   Equitable Tolling: GreenSky took active steps to conceal and misrepresent material facts relating to its unlawful conduct, including the nature and amount of the fees it charges consumers and the unlicensed nature of its lending practices. The details of GreenSky's efforts are in its possession, custody, and control, to the exclusion of Plaintiff and class members, and await discovery. When Plaintiff learned about this material information, she exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing her claims. Should such tolling be necessary, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

## CLASS ACTION ALLEGATIONS

102.   Plaintiff, pursuant to Rule 1.220(a), (b)(2), and (b)(3), brings this action on behalf of all others similarly situated ("Class")—from at least four years prior and up to

and including the filing date of this petition—("Class Period"), with the Class initially defined as:

**All persons who secured or made payments on a GreenSky-program loan in Florida between July 17, 2016 and the present.**

103.    The following persons shall be excluded from the Class (1) GreenSky and its subsidiaries and affiliates; (2) governmental entities; (3) the judge(s) to whom this case is assigned and any immediate family members thereof; and (4) anyone who has previously settled these claims with GreenSky.

104.    The claims for relief asserted herein satisfy the prerequisites for certification as a class action pursuant to Rule 1.220(a), (b)(2) and (b)(3):

a.      There are common questions of law or fact common to the Class;

b.      Plaintiff's claims or defenses are typical of the claims or defenses of the Class;

c.      Plaintiff will fairly and adequately protect the interests of the Class;

d.      The questions of law or fact common to the respective Class members predominate over any questions affecting only individual members;

e.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy; and

f.      GreenSky has acted and/or refused to act on grounds generally applicable to all the members of the class, thereby making final injunctive relief or declaratory relief concerning the class as a whole appropriate.

105.   **Numerosity.**  Defendants have engaged in millions[2] of the type of lending transactions described in this complaint, including tens or hundreds of thousands in Florida. Members of the proposed Class are thus too numerous to practically join in a single action. Class members may be notified of the pendency of this action by mail, supplemented by published notice (if deemed necessary or appropriate by the Court).

106.   **Commonality and Predominance.** This action involves common questions of law or fact, which predominate over any questions affecting individual Class members, including, but not limited to, the following:

a.   Whether GreenSky concealed its merchant fees from consumers;

b.   Whether GreenSky's charging of merchant fees violates Florida law;

c.   Whether the amount of GreenSky's merchant fees violates Florida law;

d.   Whether GreenSky concealed its incentive payments from consumers;

e.   Whether GreenSky's receipt of incentive payments violates Florida law;

f.   Whether GreenSky is a "loan broker" under Florida law;

g.   Whether GreenSky is a "credit service organization" under Florida law;

h.   Whether Plaintiff and Class members are entitled to damages, restitution, disgorgement, or other equitable relief; and,

i.   Whether GreenSky should be enjoined from engaging in this type of conduct.

---

[2] As of, approximately, the end of fiscal year 2019, GreenSky had originated over three million consumer loans.

107. **Typicality.** Plaintiff's claims are typical of the claims of the Class because, among other things, Plaintiff, like all members of the Class, received a GreenSky loan in which the amount of the merchant fee was hidden, including the basis (i.e., the merchant fee schedule and merchant program agreement) for such fee.

108. **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class that she seeks to represent; she has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

109. **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy, including, but not limited to, the following reasons:

a.      The damages or other financial detriment suffered by individual Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against GreenSky, so it would be impracticable for the members to individually seek redress for GreenSky's wrongful conduct;

b.      Even if the members of the Class could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, a class action presents far fewer management difficulties and

provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court; and

      c.     No unusual difficulties are likely to be encountered in the management of this class action.

      110.    **Ascertainability.** GreenSky is in possession of the necessary records in the form of receipts and billing statements to identify members of the Class; as such, the Class will be easily ascertainable.

**COUNT ONE:**
**VIOLATIONS OF FLORIDA'S LOAN BROKER LAW**
**(Fla. Stat. § 687.14 *et seq.*)**
*Against All Defendants*

      111.    Plaintiff, on behalf of herself and those similarly situated, realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

      112.    Plaintiff brings this count on behalf of the Class.

      113.    As stated above, pursuant to Fla. Stat. § 687.14(4)(a)-(b), a "loan broker" includes "any person" who, subject to a list of exemptions, "For or in expectation of consideration arranges or attempts to arrange or offers to fund a loan of money, a credit card, or a line of credit"; and "For or in expectation of consideration assists or advises a borrower in obtaining or attempting to obtain a loan of money, a credit card, a line of credit . . ."

      114.    GreenSky does not qualify as any of the exemptions listed in Fla. Stat. § 687.14(4).

24

115.     As described throughout this petition, the vast bulk of GreenSky's business is originating consumer loans and taking undisclosed charges thereon.

116.     GreenSky acts as a "loan broker" in numerous ways.

117.     Pursuant to Fla. Stat. § 687.141(2), a loan broker is proscribed from making or using any false or misleading representations or omitting any material facts in the offer or sale of the services of the loan broker or engaging, directly or indirectly, in any act that operates or would operate as fraud or deception upon any person in connection with the offer or sale of the services of the loan broker, despite the lack of reliance by the buyer.

118.     GreenSky has continuously violated Fla. Stat. § 687.141(2) during the Class Period.

119.     Likewise, GreenSky has continuously violated Fla. Stat. § 687.141(2) by engaging in acts that, directly or indirectly, operate as fraud or deception upon buyers (i.e., Florida consumers).

120.     Plaintiff and all Class members have been injured as a result of GreenSky's violations of the loan broker laws.

121.     GreenSky's practices, as described herein, deprived Plaintiff and all Class members of the protections offered by Florida law.

122.     Under Fla. Stat. § 687.147, "Any borrower injured by a violation of this act may bring an action for recovery of damages. Judgment shall be entered for actual damages, but in no case less than the amount paid by the borrower to the loan broker, plus reasonable attorney's fees and costs. An award may also be entered for punitive damages."

123.    In the alternative to damages, and because in such circumstance Plaintiff and the Class members would have no adequate remedy at law, they are entitled to restitution.

**COUNT TWO:**
**VIOLATIONS OF FLORIDA'S CREDIT SERVICE ORGANIZATIONS ACT**
**("CSOA")**
**(Fla. Stat. § 817.7001 *et seq.*)**
***Against All Defendants***

124.    Plaintiff, on behalf of herself and those similarly situated, realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

125.    Plaintiff brings this count on behalf of the Class.

126.    The CSOA defines a "credit service organization" ("CSO") as "any person who, with respect to the extension of credit by others, sells, provides, performs, or represents that he or she can or will sell, provide, or perform, in return for the payment of money or other valuable consideration, any of the following services:

. . .

2. Obtaining an extension of credit for a buyer; or

3. Providing advice or assistance to a buyer with regard to the services described in either subparagraph 1. or subparagraph 2."  ·

Fla. Stat. § 817.7001(2)(a).

127.    GreenSky does not qualify as any of the CSO exemptions listed in Fla. Stat. § 817.7001(2)(b).

128.    GreenSky acts as a CSO in numerous ways.  In effect, GreenSky's entire business, as described throughout, is assisting, advising, arranging, attempting to

arrange, and *actually* obtaining consumer credit (installment loans, primarily) for borrowers.

129.    GreenSky is therefore a "CSO" under Florida law.

130.    Pursuant to Fla. Stat. § 817.7005(1), a CSO is prohibited from receiving money or other valuable consideration for its services without having obtained a $10,000 surety bond in Florida.

131.    On information and belief, GreenSky has received money and/or other valuable consideration for its services (thousands of times over) in Florida without having obtained a $10,000 surety bond in Florida. GreenSky has thus violated Fla. Stat. § 817.7005(1).

132.    Pursuant to Fla. Stat. § 817.7005(2), a CSO is prohibited from receiving money or other valuable consideration for referring a buyer to grantor of credit who will or may extend the buyer credit on terms "substantially the same" as those available to the general public.

133.    As described throughout this petition, the vast bulk of GreenSky's revenues have come from receiving "merchant fees" in its origination and/or solicitation of loans on behalf of its bank partners.

134.    The terms offered *by GreenSky* are substantially the same (and, in some cases, markedly worse) as those offered to the general public. Broadly, GreenSky-branded loans carry APRs of 8 to 27%, the merchant fees excluded. These are "substantially the same terms" upon which such loans are offered to the general public.

Such point was also highlighted above with regard to the terms offered by SunTrust through its own home improvement loan program.

135.    GreenSky has thus violated Fla. Stat. § 817.7005(2) as to Plaintiff and each putative Class Member.

136.    Pursuant to Fla. Stat. § 817.7005(4), a CSO shall not "[m]ake or use any false or misleading representations or omit any material fact in the offer or sale of the services of a credit service organization or engage, directly or indirectly, in any act, practice, or course of business that operates or would operate as fraud or deception upon any person in connection with the offer or sale of the services of a credit service organization, notwithstanding the absence of reliance by the buyer."

137.    GreenSky has, countless times, violated Fla. Stat. § 817.7005(4) for substantially the same reasons as it has violated Fla. Stat. § 687.141(2), *supra*.

138.    Under the CSOA, a CSO is to meet certain affirmative duties; GreenSky has also violated the statute in this regard.

139.    Pursuant to Fla. Stat. § 817.704(1)(a), a CSO shall include in its contract with a buyer a "conspicuous statement in boldfaced type" with specific language pertaining to a consumer's right to cancel such contract within five days.

140.    Pursuant to Fla. Stat. § 817.704(1)(b), a CSO shall include in its contract with a buyer, "The terms and conditions of payment, including the total of all payments to be made by the buyer, specifying the amount of the payments to be made to the credit service organization or to some other person . . ."

141.     As described throughout this petition, GreenSky completely conceals from buyers the amount of merchant fees it receives *as a function of their transaction*. As described above, GreenSky not only conceals the amount of these fees but has expressly permitted and/or encouraged its merchants to pass the cost of the fees on to consumers.

142.     GreenSky does not disclose to Plaintiff or the putative Class Members its merchant fees.

143.     Pursuant to Fla. Stat. § 817.704(1)(c), a CSO shall include in its contract with a buyer "**[a] full and detailed description** of the services to be performed by the credit service organization for the buyer, including all guarantees and all promises of full or partial refunds, and the estimated date by which the services are to be performed or the estimated length of time for performing the services . . ." (emphasis added).

144.     Pursuant to Fla. Stat. § 817.704(2), a CSO shall include in its contract with a buyer a "Notice of Cancellation" form, including a duplicate, that is easily detachable and contains specified language in boldface concerning the consumer's right to cancel the contract within five days.

145.     Because GreenSky does not enter into contracts directly with the buyers, it fails to comply with these statutory mandates. Thus, GreenSky has violated Fla. Stat. §§ 817.704(1)(a), 817.704(1)(b), 817.704(1)(C), and 817.704(2) as to Plaintiff and each proposed Class Member.

146.     Plaintiff and all Class members have been injured as a result of GreenSky's violations of the CSOA.

147.   GreenSky's practices, as described herein, deprived Plaintiff and all Class members of the protections offered by Florida law.

148.   Pursuant to Fla. Stat. § 817.706, "Any buyer injured by a violation of this part may bring an action for recovery of damages. Judgment shall be entered for actual damages, but in no case less than the amount paid by the buyer to the credit service organization, plus reasonable attorney's fees and costs. An award may also be entered for punitive damages."

149.   In the alternative to damages, and because in such circumstance Plaintiff and the Class members would have no adequate remedy at law, they are entitled to restitution.

**COUNT THREE:**
**INJUNCTIVE RELIEF**
*Against All Defendants*

150.   Plaintiff, on behalf of herself and those similarly situated, realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs as though alleged in full herein.

151.   Plaintiff brings this count on behalf of the Class.

152.   Having no adequate remedy at law to prevent GreenSky from its ongoing illicit behavior, Plaintiff requests that this Court enjoin GreenSky from the abusive practices described in this petition.

153.   Florida consumers will be irreparably harmed by GreenSky's ongoing concealment of its plainly illegal finance charges.

154.    An injunction in this regard is also in the public interest as GreenSky was sued in Florida several years ago for essentially the same behavior and yet has failed to rectify its illegal practices; the nature of GreenSky's duplicity, as described throughout this petition, is very difficult for individual persons to discover; the amounts of fees being furtively charged by GreenSky are substantial; and GreenSky has repeatedly revealed its willingness to fund merchants who overtly prey on vulnerable people (e.g., the elderly, the infirm, the illiterate).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for the following relief:

1.  Approving of the proposed Class;

2.  Certifying Plaintiff as Class representative and her counsel as Class counsel;

3.  Declaring that Defendants committed the violations alleged herein;

4.  Granting damages, restitution, and/or disgorgement to the Class;

5.  Granting compensatory damages, the amount of which is to be determined by jury at trial;

6.  Granting punitive damages;

7.  Granting pre and post-judgment interest;

8.  Granting attorneys' fees and costs; and

9.  Enjoining GreenSky from the conduct described herein.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the Class, hereby demands a jury trial on all issues so triable.

Dated: July 17, 2020

Respectfully submitted:

s/ Darren R. Newhart
Darren R. Newhart, Esq.
FL Bar No: 0115546
E-mail: darren@newhartlegal.com
NEWHART LEGAL, P.A.
P.O. Box 1351
Loxahatchee, FL 33470
Telephone: (561) 331-1806
Facsimile: (561) 473-2946

**BELL LAW, LLC**
Bryce B. Bell
Mark W. Schmitz
Andrew R. Taylor
2600 Grand Blvd., Suite 580
Kansas City, MO 64108
T: (816) 886-8206
F: (816) 817-8500
Bryce@BellLawKC.com
MS@BellLawKC.com
AT@BellLawKC.com
 (*pro hac vice* forthcoming)

*Attorneys for Plaintiff and the Proposed Classes*